# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN  DIVISION

| | | |
|---|---|---|
| **TERRI RENAE LACKEY,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-10-BE-2838-W** |
| **CAROLYN W. COLVIN, Acting** | ] | |
| **Commissioner, Social Security** | ] | |
| **Administration,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 5, 2008, the claimant, Terri Renea Lackey, applied for supplemental security income under Title XVI of the Social Security Act. (R. 79-81). The claimant alleged disability commencing on January 15, 2008 because of mental retardation[1], bi polar disorder, and depressive disorder. (R. 111, 227). The Commissioner denied the claim both initially and on reconsideration. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on February 11, 2010. (R. 29).  In a decision dated March 25, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for supplemental security income. (R. 23).  On August 20,

---

[1] On August 1, 2013, while this appeal was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with those of "intellectual disability."  *See* 78 Fed. Reg. 46,499 & 46,501 (to be codified at 20 C.F.R. pt. 404 subpt. P app. 1).  The Administration stated that the change "does not affect a substantive change." *Id.* at 46,500. To avoid confusion, this opinion uses the same term that the parties and the ALJ used: mental retardation.

1

2010, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1).

The claimant, having exhausted her administrative remedies,  filed an action for judicial review in this court pursuant to § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3). On January 24, 2011, this court, on motion of the Commissioner, remanded claimant's case back to the Commissioner pursuant to sentence six of 42 U.S.C. § 405(g) to enable the ALJ to conduct a supplemental hearing because "critical portions of the vocational expert's testimony being inaudible" caused the Commissioner to be unable to prepare a certified record.  (R. 237-241). The ALJ held a supplemental video hearing on May 12, 2011. (R. 223-236)  On May 26, 2011, the ALJ again issued an unfavorable decision, this time concluding that claimant is capable of performing her past relevant work as a cashier.  (R. 210-218).  This decision became the final decision of the Commissioner when, on August 16, 2012, the Appeals Council again declined to grant review.  (R. 202-203).

Because the claimant had again exhausted all administrative remedies on remand, the Commissioner filed an Answer (doc. 8) in this court on January 29, 2013, resulting in the reopening of the case.  For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ erred in finding that claimant did not meet the listing of 12.05(C).

### III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d 999.  This court does not review the Commissioner's factual determinations *de novo*.  The court will affirm those factual determinations that are supported by substantial evidence.  "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432

(d)(1)(A) (2004).  To make this determination, the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed;
> (2) Is the person's impairment severe;
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1;
> (4) Is the person unable to perform his or her former occupation;
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to finding a disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see* 20 C.F.R. §§ 404.1520, 416.920.

To satisfy a listing at step three, claimant's impairment must meet "all of the criteria of

that listing, including any relevant criteria in the introduction, and [must meet] the duration

requirement."  20 C.F.R. § § 404.1525(c)(3), 416.925(c)(3).  Listing 12.05(C) contains an

introduction and also four sets of criteria, listed as criteria A through D and each separated by

"or."  Thus, if the claimant's impairment meets the requirements in the introductory paragraph

and any one of the four sets of criteria, then she meets the Listing.  Listing 12.05's introductory

paragraph states the following diagnostic description for mental retardation: "mental retardation

refers to significantly subaverage general intellectual functioning with deficits in adaptive

functioning initially manifested during the development period; i.e., the evidence demonstrates or

supports onset of the impairment before age 22."  *Id.* pt 404, subpt. P, app. 1 § 12.05 (2012).

This appeal focuses only on 12.05(C), which requires, in addition to satisfying the introductory

paragraph, satisfying the following criteria in paragraph C:  "A valid verbal, performance, or full

scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* at § 1205(C).

## V. FACTS

The claimant alleges she is unable to work because of mild mental retardation, bi-polar disorder/anxiety and mood disorder, and depressive disorder. (R. 149). The claimant, who was 34 years of age at the time of the first hearing, and 35 years old at the second hearing, completed the twelfth grade in special education classes, and received a certificate of completion rather than a diploma. (R. 34,168, 226, 230, 312). According to clinic records, the claimant stated that the reason she was placed in special education classes was that she had a learning disability. (R. 200). At the time of the first hearing, she lived with her second husband of seven years and her son. The claimant's mother-in-law had lived with the family at some point and helped her take care of the claimant's young son, but the mother-in-law died before the first hearing. ( R. 32 ). The claimant's past work experience includes part-time employment as a retail cashier (unskilled), deli sales clerk (light physical demand, semi-skilled) and unloader/stocker (heavy physical demand, semi-skilled). (R. 232-33).

Although the claimant acknowledges once using cocaine in 2009, during the pendency of this case at the administrative level, she claims no current drug or alcohol use. At some point, the DHR became the guardian of her young son because of drug charges issued against the claimant. According to the claimant, the drug charge occurred because she was living with or had furniture stored with some friends involved with methamphetamines and just happened to be on the property when the law enforcement searched the property and found the meth paraphernalia; claimant testified that she was charged with meth because of her association with

those friends even though no meth was found in her system, and she served two years on

probation, which ended in 2009.  (R. 191,  231).

### Physical Limitations

Although the claimant also alleged a history of physical limitations that contributed to her

disability, the ALJ found that none of the alleged physical limitations was severe at step two of

his analysis and did not take the physical limitations into account when determining whether the

claimant was disabled.  Because the claimant did not object to this finding, this court will not

address it as a potential error.

### Mental Limitations

In February 2007, the claimant received the diagnosis of depression and anxiety when she

sought treatment at the Maude Whatley Clinic, and she began taking Lexapro to treat those

conditions.

### Indian Rivers Mental Health Center Records

The claimant also received treatment at Indian Rivers Mental Health Center, beginning in

March of 2008 and continuing off and on throughout this appeal process.  Her records at Indian

Rivers reflect that on April 1, 2008 she came to the clinic complaining of depression and anxiety

with symptoms of  "sadness, agitation and hostility, loss of energy and sometimes feelings of

hopelessness" with no suicidal or homicidal thoughts or plans, although she acknowledged

having arguments with her step-daughter.  She reported a decrease in energy level and

concentration.  Because the claimant reported use of Lexapro in the past with some success but

that "it cost too much and she thought she is having some suicide effects from it," the nurse

prescribed instead a generic brand for Celexa, an antidepressant drug prescribed for depression,

6

anxiety, and various panic disorders.  The "Social History" of the clinic note reflects that the claimant reported that she had left work in January of 2008 "because she was not happy with pay or with working conditions.  She states that she has had about seven jobs since high school and the longest duration of one was two years."  The clinic records reflect an Axis I diagnosis of mood disorder nonspecified and an Axis II diagnosis of mild mental retardation "per client."  (R. 191, 199-200).

Clinic records reflect that a week after the April 1, 2008 visit, the claimant called the clinic, complaining that the Celexa caused nausea, so the clinic decreased her dose to 20 mg.  (R. 198).

On May 1, 2008, the nurse practitioner at Indian Rivers saw the claimant for a follow-up visit.  Because she was still having difficulties with nausea on Celexa, the nurse discontinued Celexa and placed her on Lexapro, which she had taken in the past with some success.  The nurse reported the claimant's explanation of her problem as a "nerve problem," elaborating "one minute I will be in a good mood and the next minute I want to tear someone's head off." Although she stated that she had thoughts about killing her step-daughter three months before when the step-daughter "got in her face," she denied any actual plans to hurt the step daughter, and denied other homicidal or suicidal ideation.  The only symptom of depression she reported was lack of motivation, which she claimed occurred twice a month, and she explained that "'going outside and getting away from everybody' helps when depressed and that she cheers up within '45 minutes to an hour.'" At this clinic visit, the claimant received a prescription for daily dose of 10 mg of Lexapro. (R. 191).

On July 22, 2008, the nurse practitioner saw the claimant for follow-up medication

management.  The claimant appeared alert, oriented, pleasant, cooperative, calm, and logical. She

opined that Lexapro was not working well for her and suggested Xanax.  The nurse practitioner

discontinued Lexapro and prescribed Zoloft, 50 mg., once per day, for her depression, and

Trazodone, 50 mg, once per day, for sleep.  (R.196-97).

Clinic records reflect that the claimant did not meet with the nurse practitioner from July

of 2008 until December of 2008, although the records reflect prescription refills of Zoloft and

Trazodone in the interim. (R. 193-99).

On December 2, 2008, the nurse practitioner saw the claimant at the clinic for medication

management.  The claimant advised him that her sleep had improved to a normal level, and that

the Zoloft has been helping but that she continues to feel some anxiety and hostility and sadness.

As a result of this visit, the nurse increased her prescription of Zoloft to 100 mg, and

recommended that she return in three months or as needed. (R. 193).

On April 15, 2009, the claimant returned to clinic after a four month absence.  The clinic

provided prescriptions for Zoloft (100 mg) Trazodone (50 mg) and Neurontin (100 mg), a drug

used to treat seizures and nerve pain, insomnia, and bipolar disorder.  A "Treatment Plan

Review/Revisions" page with this date included handwritten notes that were partially illegible

but included the following: "Last seen in clinic 12-2-08 & diagnosis reported per CRNP 12-11-

08 & some symptoms noted, medication change made.  Changed diagnosis per CRNP. [Illegible]

Has 4-21-09 clinic appt.  Change duration to ongoing & continue DOC.  Will be scheduled w/or

new POC [or DOC]." The notes were unclear about the specific reason for adding the neurontin

medication.  (R. 192-93).

On June 23, 2009, the claimant failed to show up at the clinic for her scheduled

appointment.  (R. 342).  Later records reflect that she smoked cocaine during this month.  (R. 329-30).

On July 15, 2009, a doctor at the clinic saw the claimant and reviewed her records to update her treatment plan.  She reported that she was having "minor anxiety," daily mood swings and minor memory and concentration problems.  However, she reported no depression or hallucinations, "no paranoia, no derealization or depersonalization, and no suicidal/homicidal ideation."  Although she said she was sleeping less, she acknowledged that she had not refilled her prescription for Trazodone  (R. 332).

Also on July 15, 2009, nurse's notes reflect that the claimant reported no problems except agitation and decreased sleep.  A mental status exam reflected no problems and noted: "Client reported that she was told by social security that she had MR status.  Client reported that she sometimes has problems remembering things."  The treatment plan was to decrease Zoloft to 50 mg,  to start Remeron, an antidepressant, and to continue using Trazodone as needed.  The notes reflect that the claimant discontinued Neurtontin approximately one month previously because of the side effects.  (R. 336 & 341).

On July 22, 2009, a nurse made a note in the file that the claimant continued having mood swings but was having difficulty affording the Remeron and requested a cheaper medication, so the clinic prescribed Celexa and discontinued Remeron and Zoloft.  (R. 340).

On November 4, 2009, a psychiatrist at the clinic saw the claimant and noted that she "feels better" although she feels depressed some days. The doctor further reported her denial of other complaints, psychosis, or feeling hopeless or worthless.   She reported taking her medication as prescribed with no side effects.  Accordingly, the doctor did not change her

9

diagnosis or her medicine; the claimant continued taking Celexa and Trazodone.  (R. 343).

On September 8, 2009, the claimant failed to show up at the clinic for her scheduled appointment.  (R. 339).

On November 24, 2009, a mental status exam report reflected no current drug problems. This report was prepared by a clinic nurse with a masters in social work and reviewed by a nurse practitioner on December 3, 2009.  In the Diagnosis and Clinical Summary, begun on that date and reviewed on December 3, 2009, the Diagnoses were listed as follows: Axis I - Cocaine abuse and Depression Disorder; Axis II - no diagnosis; Axis III - no significant medical history; Axis IV - Other psychosocial/environmental problems.  The Clinical/Integrated Summary reflects that the claimant "presented to Indian Rivers for a substance abuse assessment and substance abuse treatment referred by DHR" with the last use of cocaine in June of 2009.  According to the summary, she used cocaine only one time and had not smoked it before or since, and her son was currently living with his grandparents. (R. 329-30).

On February 11, 2010, the progress notes stated "Discontinue SA services due to being inappropriate for IOP.  Client has a psychiatric appointment in April 2010.  Continue remaining 11/24/09 treatment plan as it remains appropriate."  (R. 365).

On April 5, 2010 and June 4, 2010, the claimant did not show up for her clinic appointments. (R. 363-64).  On July 15, 2010, the notes reflect that the nurse practitioner reviewed the claimant's treatment plan. She stated: "Case, however, would have been closed due to the length of time since last contact, but client has an MD appointment."  (R. 362).  On September 9, 2010, the claimant failed to make her doctor appointment.  (R. 361).  On October 27, 2010, the plan review notes indicated that because the claimant missed her doctor

appointment, has not visited the clinic in several months and has no follow-up appointments scheduled, the case would be closed.  (R. 360).

On February 4, 2011, the Indian Rivers staff prepared a Treatment Plan Report noting the claimant's symptoms of mood instability including irritability and mood swings.  In the Clinical Summary Inquiry from the same date (with a report date of April 7, 2011), the claimant characterized her symptoms as "mood swings, irritability, and hyperness," and the person preparing the summary stated that the claimant "appeared to be manic."  Claimant reported that she had run out of Celexa and was only taking Trazodone.  (R. 347-48).

On February 16, 2011, the claimant arrived at the clinic, acknowledging that she had not been to the clinic in over a year and had not been on medication for more than six months.  She complained of increased mood swings and difficulty sleeping (R. 358).  However, on another record from the same date, the doctor records her as stating that she "sleeps good."  The notes also stated that she characterized her "Depression and anxiety fair in control, it was worse a year ago. Anger 5/10."  The doctor prescribed Prozac and Trazodone  (R. 356).

On March 16, 2011, the claimant denied any problems and claimed to be medically compliant.  When she spoke with the doctor on the same day, she reported that "Depression, anxiety, anger all getting better, states she is learning how to stay in control.  Sleeping good [without] trazodone [sic].  No [side effects] from meds.  She denies feeling wo[r]thless or hopeless.  No SI/KI/AVH and delusions.  Denies drugs, alcohol or pregnancy."  Accordingly, the drug regimen did not change.  (R. 355).

*Dr. Maio's Evaluation*

The Disability Determination Service referred the claimant to Dr. Joseph E. Maio, Ph.D. ,

11

a clinical psychologist, for a psychological evaluation, which occurred on April 23, 2008.  In that report, Dr. Maio recorded the claimant's characterization of daily activities, including "cooking, completing household chores, grocery shopping, managing her medications, and taking care of her son," including "playing outside with him."  She "denied any deterioration in her personal care or restriction of her daily activities" and, although she acknowledged "becom[ing] easily upset at others," she also acknowledged generally getting "along well with people."  She denied having difficulty understanding and remembering instructions and completing tasks, although she did admit to having difficulty understanding *new* tasks.  (R. 168).  Further, she denied feeling depressed or anxious, although she reported feeling moody and angry.

Dr. Maio's office administered the Wechsler Adult Intelligence Scale (third edition) test to the claimant, and her results are as follows: verbal IQ - 70 (2 %); Performance IQ - 77 (6%); Full Scale IQ - 71 (3%); Verbal Comprehension Index - 76 (5%); and Perceptual Organization Index - 78 (7%).  Dr. Maio noted that the claimant put forth adequate effort and he considered the results reliable.  Based on those test results, he concluded that the claimant's intellectual abilities likely fall in the mildly deficient to  range of intellectual functioning, and also determined that "her apparent level of adaptive functioning would not suggest a diagnosis of Mild Mental Retardation."  He listed her current GAF as 65, which reflects some mild symptoms or some difficulty in social or occupational functioning but generally functioning pretty well.   As to her ability to work given these results, Dr. Maio opined that she "should be capable of performing unskilled labor when she is provided adequate support, supervision, and training." His notes also reflect his questioning the claimant's reliability as an informant given that she incorrectly reported her medication prescription and her history of involvement with a drug

charge.  (R. 170-71).

*Dr. Estock's Consultative PRT*

On April 29, 2008, Dr. Robert Estock, a Birmingham psychiatrist, evaluated the claimant and performed a Psychiatric Review Technique as a non-examining consultant.  The consultant's notes indicate that he reviewed Dr. Maio's records and the tests Dr. Maio performed, and Dr. Estock gave controlling weight to Dr. Maio's findings in preparing the reports.  His notes also refer to Indian Rivers records.  Dr. Estock did not have access to the claimant's school records, although he requested them twice, but he did acknowledge the claimant's statement that she attended special education classes throughout her high school years.

Dr. Estock evaluated her for 12.04 (Affective Disorders), 1206 (Anxiety-Related Disorders), 12.09 Substance Addiction Disorders, and 12.10 (Autism and Other Pervasive Developmental Disorders).  He did not evaluate the claimant for the area that is the subject of this appeal - 12:05 (Mental Retardation), although his notes reflect his awareness that the claimant was alleging she is mentally retarded.   Under 12.04, Dr. Estock checked the box stating that a "medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above, and he identified the disorder as "Depression by hx dx'd in Feb. 2007 ... currently denied" (apparently referring to her denial of depression when she met with Dr. Maio, as stated in the section entitled "Consultant's Notes").  Under 12.06, Dr. Estock checked the same box, and he identified the disorder as "Anxiety by hx dx'd in 2/07 . . .currently denied" (apparently referring again to her denial of anxiety when she met with Dr. Maio, as stated in the section entitled "Consultant's Notes").  Under 12.09, Dr. Estock checked the same box, identifying the disorder as "R/O Amphetamine abuse" and noted "DAA denied by clmt."  Under

13

12.10, Dr. Estock checked the same box and identified the disorder as " intellectual functioning ... FSIQ-71" referring to her full scale IQ score.  (R. 172-181, 184-85).

Under the section marked "'B' criteria of the Listings," Dr. Estock made the following determinations: Restriction of Activities of Daily Living - Mild; Difficulties in Maintaining Social Functioning - Mild; Difficulties in Maintaining Concentration, Persistence, or Pace - Moderate; Episodes of Decompensation, Each of Extended Duration - None. (R. 182).

Under the section marked "'C' Criteria of the Listings," Dr. Estock determined that "Evidence does not establish the presence of the 'C' criteria."  (R. 183).

*Dr. Estock's Consultative Mental RFC Assessment*

In his consultative Mental RFC Assessment, Dr. Estock made the following conclusions: out of the list of twenty discrete abilities, he evaluated the claimant as "not significantly limited" in fifteen, "moderately limited" in five, and markedly limited in none.  The abilities that he considered to be "moderately limited" were as follows:   Category of Understanding and Memory - ability to understand and remember *detailed* instructions; Category of Sustained Concentration and Persistence - ability to carry out *detailed* instruction; Category of Social Interaction - ability to accept instructions and respond appropriately to criticism from supervisors; Category of Adaptation - ability to respond appropriately to changes in the work setting and ability to set realistic goals or make plans independently of others.   In the notes on his RFC Assessment, Dr. Estock explained that given the claimant's past history of working two years as a cashier at a gas station, "she would be able to: 1.  Understand, [remember] and complete simple instruction for simple tasks. 2.  Complete an 8 hour work day involving simple [tasks] provided all customary breaks. 3.  Work is a supportive environment where supervision is not confrontation[al] and job

14

training is adequate. 4. Complete and adapt to all work demands involving simple tasks." (R. 186-189).

*The ALJ Hearings*

*First hearing: February 11, 2010*

During her testimony in the first hearing on February 11, 2010, the claimant testified that her problem with depression resulted in her crying a lot; being "upset all the time" about "[a]ny little thing"; not wanting to do anything; and having problems going outside of the house (her mother-in-law would take the claimant's young son outside to play because the claimant did not want to do so). Regarding anxiety, the claimant testified "one minute you're good to go and the next minute somebody says, hey, what you want for supper and you go off." (R. 32).

When asked about her medication, the claimant testified that she was taking Celexa and Trazodone, once a day each. As to the efficacy of the Celexa, she stated: "So far so good. We may have to up that dosage . . .because by . . about lunchtime or so I might need another dose of it." She testified that she took half a Trazodone every so often when she needed it to sleep. (R. 34-35).

The claimant characterized herself as being slow at reading but, when given time, she can read most documents without assistance. (R. 35).

When asked about her daily activities, she testified that she handled household chores, grocery shopping, and cooking. She could drive but only in the daytime because she could not see to drive at night. When her son arrived home from school, she cooked supper, bathed him, watched t.v. with him, and prepared him for bed. (R. 35-37).

15

*Second Hearing: May 12, 2011*

At the subsequent hearing on May 12, 2011, the claimant testified that she has mood swings, and problems with regulating the medication that causes concentration problems.  She stated that her doctors had recently increased her Prozac to 20 milligrams per day to decrease her frustration and that she now took Trazodone daily, one -fourth a pill in the morning, one-fourth in the afternoon, and one-half at night.  She testified that her moods vary, but when she is having a bad day, even a simple question would cause her to "go off." (R. 227-28).

Regarding her depression, she explained that "[I] [j]ust don't want to get up and do nothing, don't want to talk to nobody, don't want to go nowhere, just want to lay there."  She further stated that she does not go out socially.  (R. 231-32).

Although the ALJ asked the claimant about her drug charge, she recounted the meth charge and her two-year probation for that charge, but did not reveal her cocaine use in 2009 reflected in her Indian Rivers medical records.

A vocational expert testified at the second hearing.  The ALJ asked him to  determine whether jobs exist based on a hypothetical individual of claimant's age, educational background, and past work history who "has no exertional limitations, has some non-exertional limitations (inaudible) functioning (inaudible), and she can understand, remember and carry out simple instruction, and she can complete an eight-hour workday doing simple tasks, with customary work breaks, she should work in a supported environment, where supervision is not confrontational, and job training is adequate, and she can complete and adapt to all work demands involving simple tasks." The VE found that such an individual could perform her previous position of basic cashier at an unskilled level and also could perform the position of

16

light housekeeper/cleaner (unskilled) and automatic carwash attendant (light work, unskilled). (R. 234-35).

*The ALJ 's Decision After the Second Hearing*

On May 26, 2011, the ALJ rendered the decision currently under review.  In that decision, at step one of the analysis, the ALJ found that the claimant has not engaged in substantial gainful activity since February 5, 2008.  At step two, the ALJ further found that the claimant suffers from two severe impairments:  intellectual functioning and depressive disorder.  In so finding, the ALJ determined that the claimant's conditions of carpal tunnel syndrome and Bell's palsy are nonsevere for the purposes of the step two consideration because "these conditions appear to have resolved by September of 2004."  (R. 212-13).

At step three, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals a listing under 12.04, 12.05, 12.06, or 12.10.  (R. 213). The claimant argues in this appeal that the ALJ erred in finding that the claimant did not meet listing 12.05; therefore, the court will focus on the decision's analysis of that listing.

The ALJ noted the claimant's valid IQ score of 70, but further noted the Eleventh Circuit Court of Appeal's holding in *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986), that the Listing "does not require the Secretary to make a finding of mental retardation based on the results of an IQ test alone."  Instead, the ALJ explained that "[i]n addition to a valid IQ score of 70 or less, with an accompanying additional severe physical or mental impairment [as required by paragraph C], there must also be accompanying significant deficits in adaptive functioning." Therefore, the ALJ noted her obligation to "'take into account the intelligence test' as one

17

specific factor" and to examine the test result "within the context of reported daily activities and behavior."   The ALJ noted that Dr. Maio, a mental health specialist whose findings she gave substantial weight,  had looked at the claimant's daily activities and behavior and had concluded that her "apparent level of adaptive functioning was inconsistent with a diagnosis of mental retardation, and diagnosed the claimant with  intellectual functioning instead of mental retardation."  She also noted that, based on the records presented to her, the claimant has never received a diagnosis of mental retardation, but instead has been characterized consistently as exhibiting  intellectual functioning.  (R. 214-15, 217).

Accordingly, the ALJ determined that the claimant did not meet Listing 12.05(C), but instead characterized the claimant's intelligence as falling within "the range of  intellectual functioning."  Although the claimant does not raise as errors the ALJ's findings regarding the other listings, the ALJ also addressed Listings 12.04, 12.06, and 12.10, and found that the claimant's impairmens did not fall within those Listings. (R. 213-15).

The ALJ also found that the claimant has the residual functional capacity "to perform a full range of work at all exertional levels but with the following nonexertional limitations: 1) the claimant can understand, remember, and carry out simple instructions; 2) the claimant can complete an 8 hour work day involving simple tasks provided she is afforded all customary breaks; 3) the claimant's work environment should be supportive, with non-confrontational supervision and adequate job training; and 4) the claimant can complete and adapt to all work demands involving simple tasks."  (R. 215).

As support for this finding, the ALJ pointed to the findings of Dr. Estock and Dr. Maio, whose findings she characterized as "uncontradicted by other objective medical evidence" and to

18

which she gave substantial weight.  The ALJ concluded  that the claimant has some degree of

limitation from her diagnosed mental conditions but the limitations would not prevent her from

performing all competitive work.  The ALJ stated that she reached this conclusion after

completing "a thorough review of the evidence of record, including the claimant's allegations

and testimony, forms completed at the request of Social Security, the objective medical findings,

medical opinions, school records, and other relevant evidence."  (R. 216-17).

At step four, given that specific RFC and the VE's testimony, the ALJ determined that the

claimant was able to perform her past relevant work as a cashier, and that she was not disabled as

that term is defined by the Social Security Act. (R. 218).

## VI. DISCUSSION

The sole error that the claimant raises on appeal is whether the ALJ erred in finding that

the claimant did not meet Listing 12.05C.  That Listing provides as follows:

> *12.05 Mental retardation:* Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; *i.e.,* the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B,
> C or D are satisfied.
> ***
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
> other mental impairment imposing an additional and significant work-related
> limitation of function;
> ***

20 C.F.R. pt. 404 subpt. P/app. 1, 12.05.

The introduction to Mental Disorders provided in 12.00A lists the nine diagnostic

categories, including 12.05 as one of the nine, and addresses 12.05 separately, explaining:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings.  Listings 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies *the diagnostic description in the introductory paragraph **and** any one of the four sets of criteria*, we will find that your impairment meets the listing. *** For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.,* is a "severe" impairment(s), as defined in § § 404.1520(c) and 416.920(c).  If the additional impairment(s) does not cause limitations that are "severe" as defined in § 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. p. 404 subpt. P/app. 1, 12.00 (emphasis added).

The Social Security Administration's Program Operations Manual System (POMS) states that the phrase "adaptive functioning" in 12.05's introductory paragraph refers to "the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age."  POMS d124515.056(D)(2).

The claimant argues that the claimant meets this Listing because she had mental deficits that manifested before age 22, as reflected in the fact that she was in special education classes in school; because she received a valid verbal IQ score of 70; and because she has other significant, work-related limitation of function, including mood swings and depressive disorder.

The Commissioner argues that "a claimant must *first* show that she has mental retardation and *then* present sufficient evidence to satisfy the (C) criteria."  (Comm.'s Br., doc. 11, at 5). The Commissioner asserts that the claimant has not met all the diagnostic requirements of mental retardation set out in the introductory paragraph.   Obviously the two parties differ about what the introductory paragraph of 12.05 requires.

The court looks to the Listing and to the case law applying it to determine which

argument prevails.  The Eleventh Circuit Court of Appeals has explained that to meet the 12.05

Listing, the claimant must satisfy each diagnostic requirement of the introductory paragraph; a

claimant "must at least (1) have significantly subaverage general intellectual functions; (2) have

deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age

22." *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997).  Then, *in addition to* the

diagnostic requirements set out in the introductory paragraph, the claimant must meet one of the

four sets of criteria found in 12.05 (A), (B), (C), or (D) to show that the mental retardation is

sufficiently severe.  *See* 20 C.F.R. p. 404 subpt. P/app. 1, 12.00 (emphasis added); *see also*

*Perkins v. Comm'r of Soc. Sec.,* No. 13-12024, 2014 WL 223905, *2 (11th Cir.  Jan 22, 2014)

(per curiam) (quoting the *Crayton* decision's listing of the diagnostic paragraph's criteria in

12.05 and stating that "[a] claimant must meet these diagnostic criteria in addition to one of the

four sets of criteria found in 12.05 (A), (B), (C), or (D) . . . ."); *Hinkel v. Comm'r of Soc. Sec.*,

539 F. App'x  980, 985 n. 9 (11th Cir. 2013) (per curiam) (noting that 12.05(C) requires "the

claimant to satisfy *both* the criteria in the introduction and the specific criteria to meet a listing").

Applying the Eleventh Circuit's explanation to the instant case, where the claimant relies

on 12.05(C),  the claimant must meet the three diagnostic requirements in the introductory

paragraph and *also* meet the requirements set forth in (C).

The ALJ in the instant case recognized that the claimant must meet those three diagnostic

requirements in the introductory paragraph, and found that the claimant had failed to show the

required significant deficits in adaptive functioning.  Noting that the claimant had *never received*

*a diagnosis of mental retardation*, the ALJ gave great weight to the finding of Dr. Maio, a mental

health professional who examined the claimant, that the claimant's "apparent level of adaptive

functioning would not suggest a diagnosis of Mild Mental Retardation," but instead supported a diagnosis of " Intellectual Functioning." (R. 214).

Supporting Dr. Maio's finding regarding adaptive functioning is the claimant's own acknowledgment in records and testimony about a variety of activities that she routinely performs: cooking, completing household chores, playing outside with her son, grocery shopping, managing her medications, completing tasks as long as they are not new tasks, understanding and remembering simple instructions, maintaining her own personal hygiene, and taking care of her son. Further supporting her level of adaptive functioning is her work history at various jobs, one that endured for at least two years, and her own explanation that she left her last job because of dissatisfaction with the pay and working conditions, not because of a difficulty performing job duties.

The claimant places great emphasis on her verbal I.Q. score of 70, the highest score that still qualifies for mental retardation under paragraph C. The court notes that the verbal I.Q. score was the only I.Q. score falling within the 60-70 range: her performance I.Q. (77), full scale I.Q. (71), Verbal Comprehension Index (76) and Perceptual Organization Index (78) were all above 70. However, the ALJ correctly points out that the Eleventh Circuit has specifically rejected the notion that the 12.05 Listing requires the ALJ to make a finding of mental retardation based on the I.Q. results alone. *See Popp,* 779 F.2d at 1499. Rather, the ALJ must determine whether the claimant meets the diagnostic requirements in the introductory paragraph *and* the paragraph C requirements. Because the claimant cannot meet the requirement of requisite deficits in adaptive functioning, she has not satisfied the introductory diagnostic paragraph requirements.

Further, the Eleventh Circuit has explained that the ALJ *must* examine the I.Q. test

results within the context of reported daily activities and behavior to ensure consistency. *Id.* "[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir. 1992). Thus, a valid I.Q. score of 60-70 after age 22 "create[s] a rebuttable presumption of a fairly constant IQ throughout [a claimant]'s life." *Hodges v. Barnhart,* 276 F.3d 1265, 1269 (11th Cir. 2001).

In the instant case, when the ALJ examined the I.Q. test results in the context of the claimant's reported daily activities and behavior, as the Eleventh Circuit instructed, she found the daily activities and behavior to represent a higher level of functioning, and thus, to be inconsistent with the test results. The opinions of the medical professionals supported the ALJ's findings. Thus, the claimant's activities and behavior rebutted the presumption and showed the claimant did not have "deficits in adaptive functioning." (R. 214-15).

For all of these reasons, the court finds that substantial evidence supports the ALJ's finding that the claimant fails to meet the adaptive functioning requirement in the 12.05's introductory paragraph, and thus, fails to meet Listing 12.05(C). The claimant raises no other error.

## VII.  CONCLUSION

For the reasons stated, this court FINDS that substantial evidence supports the decision of the Commissioner, and it is due to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 28th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE